IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LAMOTTE JOHNS, | § | |
| | § | No. 441, 2024 |
| Defendant Below, | § | |
| Appellant, | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. 2208009197A/B  (N) |
| | § | |
| Appellee. | § | |

Submitted: September 24, 2025
Decided: December 16, 2025

Before **VALIHURA**, **LEGROW**, and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court. **AFFIRMED.**

Herbert W. Mondros, Esquire, RIGRODSKY LAW, PA, Wilmington, Delaware, Karl Schwartz, Esquire, Alan Tauber, Esquire, WISEMAN & SCHWARTZ, Philadelphia, Pennsylvania for Appellant.

Carolyn S. Hake, Esquire, DELAWARE DEPARTMENT OF JUSTICE, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice:

## I.    INTRODUCTION

In September of 2021, law enforcement began to receive anonymous tips that Appellant, Lamotte Johns ("Johns"), was dealing drugs out of his home at 514 West 6th Street, Wilmington, DE.  After subsequent, independent surveillance, police secured a search warrant for Johns' home and found substantial evidence of the alleged crimes as well as a firearm belonging to Johns, who is a felon.  Johns sought to suppress the fruits of the search but the Superior Court denied his motion.[1]  The matter went to trial.  After a four-day trial, Johns was convicted of Possession of a Firearm by a Person Prohibited ("PFBPP"),[2] Possession of Ammunition by a Person Prohibited ("PABPP"),[3] two counts of Drug Dealing,[4] Receiving a Stolen Firearm,[5] Possession of a Firearm During the Commission of a Felony ("PFDCF"),[6] and Possession of Drug Paraphernalia.[7]  On October 11, 2024, the Superior Court sentenced Johns to an aggregate of seventeen years of incarceration unsuspended, followed by decreasing levels of supervision.[8]  Johns raises five issues on appeal.

---

[1] *State v. Johns*, 2023 WL 3750432 (Del. Super. May 31, 2023).

[2] App. to Appellant's Second Corrected Opening Br. [hereinafter A___ ] at 677 (Trial Tr. Excerpt, Apr. 4, 2024 at 60:17-22).

[3] A678 (Trial Tr. Excerpt, Apr. 4, 2024 at 61:1-4).

[4] A629 (Trial Tr. Excerpt, Apr. 4, 2024 at 12:13-21).

[5] A629-30 (Trial Tr. Excerpt, Apr. 4, 2024 at 12:22-13:2).

[6] A630 (Trial Tr. Excerpt, Apr. 4, 2024 at 13:3-6).

[7] A630 (Trial Tr. Excerpt, Apr. 4, 2024 at 13:7-10).

[8] *See* Ex. A to Appellant's Second Corrected Opening Br. (Sentence Order dated Oct. 11, 2024); A694-96 (Excerpt of Sentencing Tr., Oct. 11, 2024 at 14:11-16:6) (outlining Johns' sentence).

First, and second, Johns argues that certain information in a record from the National Crime Information Center ("NCIC"), which was referred to at trial through the statements of a police officer, constituted both impermissible hearsay and a violation of his right to confrontation under the Sixth Amendment. Johns did not raise either issue below, and so the standard of review on these matters is plain error. Under the plain error standard, an error cannot be plain in the absence of a ruling by this Court or other binding authority, and where other courts are divided. Because that is the case here, we **AFFIRM** the decision of the Superior Court on these issues.

Third, Johns argues that the Superior Court erred in denying his motion to suppress the evidence gathered by police pursuant to the warrant executed at his residence on August 17, 2022. He asserts that the tips were from anonymous sources and, thus, were too unreliable to furnish the probable cause necessary for the warrant to be constitutional. Like the Superior Court, we consider only the final tip from July 2022 (assuming, *arguendo,* that the others are impermissibly stale). The Superior Court was correct in determining that the tip, in combination with corroboration by an independent police investigation, constituted probable cause. Therefore, on that matter, we **AFFIRM** the decision of the Superior Court.

Fourth and fifth, Johns argues that 11 *Del. C.* § 1448, under which he was convicted of PFBPP, and PABPP, is unconstitutional both on its face and as applied to him. Once again, both arguments are raised by Johns for the first time on appeal.[9] Our Court has held

---

[9] Johns' counsel chose to make no argument on these issues before this Court at the September 24, 2025 oral argument. Instead, Johns was content to rely upon his briefs.

3

that a facial challenge fails when a single constitutional application of a statute exists, even if the statute may not be constitutional in all of its applications.[10] Given that we are reviewing the Superior Court for plain error, we are confident that Section 1448, which prohibits felons convicted of drug-related and other crimes from possessing firearms, is facially valid. Johns' as-applied challenge requires a careful evaluation of his unique personal, criminal, and postconviction background. Here, the record before us lacks the information needed for such an evaluation. Without having been presented with the necessary information on Johns' background, we hold that the Superior Court did not err by not addressing the issue *sua sponte*.

In sum, we reject all of John's challenges on appeal and **AFFIRM** the judgment of conviction.

## II.    *RELEVANT FACTUAL AND PROCEDURAL BACKGROUND*

In September of 2021, members of the Delaware Drug, Organized Crime, and Vice Division ("DOCV") received a tip from an anonymous source who reported that Johns was "actively selling illegal drugs out of 514 West 6th Street, Wilmington, DE (hereinafter "514")."[11] The tip further specified that Johns sold marijuana, tobacco, and alcohol

---

[10] *See United States v. Rahimi,* 602 U.S. 680, 693 (2024) ("[A facial challenge] is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exist under which [a statute] would be valid.' That means to prevail, the Government need only demonstrate that [a statute] is constitutional in some of its applications." (citation omitted) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Sierra v. Dep't of Servs. for Child., Youth & their Fams.*, 238 A.3d 142, 156 (Del. 2020) ("For a facial challenge to succeed, the statute cannot be valid under any set of circumstances.").

[11] Unless otherwise noted, the facts concerning the contents of the underlying affidavit are taken directly from the document itself. App. to State's Answering Br. [hereinafter B__ ] at 17 (Affidavit

illegally out of the residence. The tipster claimed to have personally witnessed these things while being a customer at 514, which Johns also used as an unlicensed barbershop. Finally, the tipster added that Johns had a young, approximately twelve-year-old daughter, who lived with him at 514.

At some unspecified date later in September, the DOCV received another anonymous tip.[12] The second September tipster alleged substantially the same information that the first did, but added that Johns kept a loaded, silver-colored firearm in his bedroom, that he also sold cocaine out of 514, and that he stored drugs on the premises in "containers" and then packaged them in "re-sealable containers" which he kept in a grey tote box, also in his bedroom.[13] The tip included some additional identifying information about Johns, stating that he drove a silver Mercedes Benz with a Delaware registration of "52937."[14]

The record before us suggests that nothing happened with this information for ten months until July of 2022 when the DOCV received a third anonymous tip.[15] That tip alleged that Johns was "selling large quantities of marijuana and other illegal substances"

---

& Application in the Matter of 514 W. 6th St. Wilmington, DE 19801, and Lamotte Johns [hereinafter Aff.] ¶ 3). The first tipster is designated as "AS1" in the affidavit. B17 (Aff. ¶ 3).

[12] *Id.* at ¶ 4. This tipster is designated as "AS2" in the affidavit. *Id.*

[13] B17 (Aff. ¶ 4).

[14] *Id.*

[15] *Id.* at ¶ 5. This tipster is designated as "AS3" in the affidavit. Appellant's Opening Brief states that it is not clear whether any (or all) of the tips following the first came from different, anonymous individuals or the same anonymous individual. *See* Second Corrected Opening Br. at 6. The State also does not say specifically say whether they were different people. Throughout the course of the affidavit, each tipster is designated with a different short pseudonym (AS1, AS2, and AS3). B17 (Aff. ¶¶ 3-5). The separate designations suggest the sources were different. *See also* B3 (Johns' Mot. to Suppress Evidence at 3) (referring to "AS2" as "another source" and "AS3" as " a third source.").

from 514, and mentioned that Johns sold food and alcohol from the premises as well.[16] The tipster explained that Johns was conducting his illegal drug transactions "by means of his un-licensed barbershop" which was likewise operated out of 514.[17] Like the second September tip, the July 2022 tip included more details on where and how Johns stored the illegal substances, this time specifying that Johns kept drugs in a bedroom closet on the second floor, in the basement, and throughout the premises in "hidden traps."[18] Johns reportedly sold the substances prepackaged and primarily at night.[19] The July tipster also claimed to have seen Johns with a firearm on his waist, adding that Johns was a "person prohibited from possessing a firearm due to a prior felony gun related charge."[20] Finally, the tipster provided more identifying information regarding Johns: his date of birth, cell phone number, and name.

The following summarizes each tip and what information it contained:

The First September 2021 Tip:[21]
    (1) Suspect's name was Lamotte Johns
    (2) Johns was actively selling drugs, alcohol, and tobacco illegally from 514 West 6th Street, Wilmington, DE ("514")
    (3) Johns is a felon
    (4) Johns possesses multiple firearms in 514
    (5) Johns utilizes 514 as a barbershop
    (6) Johns has an approximately twelve-year-old daughter living at 514

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] B17 (Aff. ¶ 5).

[20] *Id.*

[21] *Id* at ¶ 3.

The Second September 2021 Tip:[22]

    (1) Suspect's name was Lamotte Johns

    (2) Johns sells marijuana and cocaine out of 514

    (3) Johns stores the drugs in containers, and packages them in resealable containers in a grey tote box in his bedroom

    (4) Johns is a felon

    (5) Johns possesses multiple firearms on the premises

    (6) One of John's firearms is silver, loaded, and kept in the bedroom

    (7) Johns operates a silver Mercedes Benz with the Delaware Registration: "52937"

The July 2022 Tip:[23]

    (1) Suspect's name is Lamotte Johns

    (2) Johns is selling large quantities of marijuana and other illegal substances out of 514

    (3) Johns conducts his illegal drug transactions by means of an unlicensed barbershop run out of 514

    (4) Johns hides the drugs in his bedroom closet, in the basement, and in hidden traps throughout 514

    (5) Johns hides firearms in 514

    (6) Johns keeps a firearm on his waist

    (7) Johns is a person prohibited from possessing a firearm due to a prior felony gun related charge

    (8) Johns' date of birth and phone number

Following the receipt of the July 2022 tip, the DOCV began an investigation into Johns and his activities. First, the DOCV confirmed much of the background and identifying information contained in the tips through a search of the Delaware Criminal Justice Information System ("DELJIS"), including Johns' name, address, phone number, vehicle, and person-prohibited status.[24] The DOCV then began surveilling 514.

---

[22] *Id.* at ¶ 4.

[23] *Id.* at ¶ 5.

[24] *Id.* at ¶ 6.

7

During the first week of August 2022, DOCV agents witnessed a vehicle arrive at 514.[25] The driver exited the vehicle, approached 514, and had a brief interaction in the doorway with Johns. Shortly afterwards, the driver returned to his vehicle and drove away, whereafter police stopped him for a moving violation. During the course of the traffic stop, police discovered the driver to be in possession of a green, leafy substance, later determined to be marijuana, which the driver disclosed he purchased at 514 from a friend he knew from "cutting hair."[26]

On August 11, 2022, members of DOCV surveilling 514 witnessed a black male, later identified as Charles Webster, arrive at the residence and visit inside for approximately one hour.[27] Webster then exited the residence, entered his vehicle, and drove off. Police continued mobile surveillance on the vehicle until they were able to stop Webster for failing to signal.[28] Immediately, police noticed that "Webster was exhibiting signs of nervousness, [including] heavy exaggerated breathing patterns."[29] Webster "appeared unable to remain focused on [the police's] comments and questions, which was also interpreted as a sign of nervousness."[30] During the course of the traffic stop, police discovered that his registration was fictitious and his insurance had expired. When police

---

[25] B18 (Aff. ¶ 7).

[26] *Id.* (quoting the driver). The gender of the driver is not disclosed in the affidavit. We have randomly ascribed the masculine gender in this opinion.

[27] *Id.* at ¶ 9.

[28] B18 (Aff ¶ 9).

[29] B19 (Aff. ¶ 9).

[30] *Id*.

asked Webster to exit the vehicle, Webster "advised Detectives that he did not want to exit his vehicle because he didn't want to be searched." When police *ordered* Webster to exit the vehicle and advised him that he was resisting arrest in failing to do so, Webster fled, speeding off out of sight.

With this information, police applied for, and were granted, a warrant to search 514 on August 15, 2022.[31] Police searched 514 two days later, on the 17th.[32] The search proved fruitful. Police seized a black and silver Taurus .38 caliber firearm loaded with five rounds. The gun was stored in a shoebox with a digital scale and a wallet containing cards in Johns' name.[33] Police also seized sixteen pounds of marijuana, much of it packaged in foil and plastic baggies, $15,419 in cash, and 79 methamphetamine pills.[34]

On October 10, 2022, a grand jury indicted Johns for Drug Dealing (two counts), PFBPP, PABPP, Receiving a Stolen Firearm, Possession of Drug Paraphernalia, and Conspiracy Second Degree.[35] Johns moved to suppress the evidence gathered as a result of the August 17th search of his residence.[36] The Superior Court denied the motion.[37] Johns argued below, as he does here, that the facts alleged in the affidavit underlying his search

---

[31] B14 (Search Warrant for 514 West 6th Street, Wilmington DE, dated Aug. 15, 2022).

[32] *See* A0146-47 (Excerpt of Trial Tr., Apr. 1, 2024, Testimony of Jeffery Silvers [hereinafter Silvers Test.] 103:20-104:1).

[33] A151-52 (Silvers Test. 108:1-109:10).

[34] A157-58 (Silver Test. 114:18-115:11); *see* A198-201 (Excerpt of Trial Tr., Apr. 1, 2024, Testimony of Christopher Rosaio [hereinafter Rosaio Test.] 155:1-163:23); A683 (Excerpt of Sentencing Tr., Oct. 11, 2024 at 3:13-17).

[35] *See* A1 (Superior Court Criminal Docket).

[36] B2 (Johns' Mot. to Suppress Evidence).

[37] *State v. Johns*, 2023 WL 3750432, at *1 (Del. Super. May 31, 2023).

9

warrant were insufficient for a magistrate to find probable cause.[38] Specifically, Johns argued that the 2021 tips were too stale to be considered, and that the July 2022 tip was both too stale *and* too unreliable to be considered. The Superior Court assumed that the 2021 tips were impermissibly stale.[39] Focusing its attention, then, on the July 2022 tip, the investigative work by the DOCV, and the traffic stops, the Superior Court rejected Johns' argument and found that there were sufficient facts to support a finding of probable cause.[40] The Superior Court observed that the July 2022 tip itself was insufficient to justify a search warrant. However, the court rejected Johns' contention that the tip could not be part of the determination of probable cause due to its lack of reliability. This argument, the court stated, "ran contrary to Delaware law."[41] The court explained that "an anonymous tip can be considered without a reliability analysis when the tip is corroborated by later observations of police."[42] And here, the tip was corroborated by the "two later traffic stops which flowed from the surveillance."[43] In any event, the court stated that it found the information gleaned from the DOCV investigation and the traffic stops, standing alone, to be sufficient to support a finding of probable cause.

---

[38] *See id.* at *2.

[39] *Id.* The Superior Court noted that it could not say, as a matter of law, whether the July 2022 tip was stale. *Id.*

[40] *Johns,* 2023 WL 3750432, at *3.

[41] *Id.*

[42] *Id.* (citing *Diggs v. State*, 257 A.3d 993, 1008-1009 (Del. 2021)).

[43] *Id.*

10

The case proceeded to trial, and, among other witnesses, the State called Detective Christopher Rosaio to testify about what he found during the search of 514.[44] In the course of Rosaio's testimony, the State asked him whether he had "run any searches" on the firearm found in the bedroom.[45] Rosaio replied, stating: "Yes, I conducted a wanted check on the firearm through NCIC,[46] which determined that it was reported stolen out of South Carolina."[47] At this point, both counsel for the State and counsel for Johns approached the bench and discussed whether or not it was a good time to break for the day. Johns' counsel never raised an objection to Rosaio's statement regarding the NCIC information.

Johns was eventually found guilty of two counts of Drug Dealing, PFDCF, PFBPP and PABPP, Receiving a Stolen Firearm, and Possession of Drug Paraphernalia. He was found not guilty of Conspiracy in the Second Degree. The Superior Court sentenced Johns for a total period of incarceration of 17 years unsuspended.[48] At no point in the proceedings below did Johns raise an issue concerning the constitutionality of 11 *Del. C.* § 1448. Johns filed a timely Notice of Appeal on October 22, 2024.

---

[44] *See* A0136 (Rosaio Test.).

[45] A209 (Rosaio Test. at 166:5-6).

[46] The parties offer basically no information in their briefing about what the NCIC is, what its function is, how it gathers the information contained in its database, or what legal duties or standards govern the supply, access, and use of the information. State's Answering Br. [hereinafter Answering Br.] at 10.

[47] A209 (Rosaio Test. at 166:7-9) Johns misattributes this testimony to detective "Jeffrey Silver [sic]" (Jeffrey Silvers) in his Second Corrected Opening Brief. *See* Second Corrected Opening Br. at 8.

[48] *See* Exhibit B to Apellant's Second Corrected Opening Br. (Sentencing Order dated Oct. 8, 2024).

### III. STANDARD OF REVIEW

The issues of hearsay, the Sixth Amendment's Confrontation Clause, and the Second Amendment are all reviewed under a plain error standard because of Johns' failure to raise these issues below.[49] With respect to the one matter Johns did raise below, the constitutionality of his search warrant, where the facts are not disputed and only a constitutional claim against the existence of probable cause exists, this Court reviews the trial court's legal conclusion *de novo.*[50] With respect the Superior Court's denial of a motion to suppress, this Court reviews the matter for abuse of discretion.[51]

### IV. ANALYSIS

**A. *The Superior Court Did Not Commit Plain Error in Failing to Exclude the NCIC Evidence* Sua Sponte.**

Johns argues that the information from the NCIC record identifying his firearm as stolen was inadmissible hearsay and that the State's reliance on it at trial violated his Sixth Amendment rights. Where a party completely fails to object to the admissibility of evidence at the trial level, that party is generally precluded from raising the objection for the first time on appeal.[52] However, this Court may "take notice of 'plain errors affecting substantial rights' of the parties on appeal, even though the error was not brought to the attention of the trial court."[53] The plain error standard of review requires that "the error

---

[49] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986); *see* Supr. Ct. Rule 8.

[50] *Terreros v. State*, 312 A.3d 651, 660 (Del. 2024).

[51] *Id.* at 660.

[52] *Wainwright*, 504 A.2d at 1100; *see* Supr. Ct. Rule 8.

[53] *Id.* at 1100.

complained of [] be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[54]

The latter half of this rule — that the error must jeopardize the fairness and integrity of the trial process — is not the focus of our analysis. That part of the test is satisfied when the error would have affected the outcome of the trial.[55] Here, it is undisputed that without the information from the NCIC identifying the firearm as stolen, the State would not have been able to convict Johns under 11 *Del. C.* § 1450 (receiving a stolen firearm).[56] Therefore, our analysis focuses on the first half of the plain error rule, namely, that the error complained of must be "clearly prejudicial to substantial rights[,]"[57] or, put simply, "plain."

For an error to be plain, the error must be a "material defect[] which [is] apparent on the face of the record; which [is] basic, serious, and fundamental in [its] character, and which *clearly* deprive[s] an accused of a substantial right or which *clearly* show[s] manifest injustice."[58] Where, as here, no objection was made, the fact that some error has occurred

---

[54] *Id.*

[55] *Morales v. State*, 133 A.3d 527, 532 (Del. 2016).

[56] *See* 11 *Del. C.* § 1450. The only evidence the State proffered concerning the firearm being stolen was the information from the NCIC database. Thus, without the NCIC's information, the State would not have been able to prove Johns guilty of violating Section 1450. The State, in its briefing, does not dispute that this would have been the case.

[57] *Wainwright*, 504 A.2d at 1100.

[58] *Id.* (emphasis added).

13

must be so obvious that the Superior Court ought to have "intervened *sua sponte* to correct it."[59]  This Court, in *Johnson v. State*,  stated that:

> [i]f neither the United States Supreme Court nor this Court has definitively ruled on the issue [at hand], and the federal courts that have addressed the issue are divided, we conclude that the Superior Court's failure to exclude such evidence *sua sponte*, in the absence of any contemporaneous defense objection [does] not constitute plain error.[60]

We acknowledge that *Johnson* states that there is no plain error when the United States and Delaware Supreme Courts are silent and where "*federal*" courts are divided. Yet we see no reason to read this rule narrowly and limit the inquiry of a matter's "plainness" to divisions in only federal courts.  The underpinning of any plain error analysis is that a question's answer is not clear.  This point can be argued in different ways and a division in federal courts is just one of them.  It makes sense that *Johnson* framed the principle with federal courts in mind, since *Johnson* involved a federal, Fourth Amendment issue that was hotly debated at the time and that generated a split of authority in federal

---

[59] *Morales*, 133 A.3d at 532 (quoting *Whittle v. State*, 77 A.3d 239, 248 (Del.2013)).

[60] 813 A.2d 161, 166 (Del. 2001); *see also United States v. Flores-Juarez*, 723 F. App'x 84, 89 (3d Cir. 2018) ("For an error to be 'plain,' it must be 'clear or obvious rather than subject to reasonable dispute.'  The existence of divergent interpretations among the Courts of Appeals demonstrates a reasonable dispute about how to apply [the law at issue]" (citation omitted) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009))); *United States v. Thompson*, 82 F.3d 849, 855 (9th Cir. 1996) ("[W]e do not see how an error can be plain error when the Supreme Court and this court have not spoken on the subject, and the authority in other circuits is split." (quoting *United States v. Alli–Balogun,* 72 F.3d 9, 12 (2d Cir.1995)); *United States v. Urena*, 140 F. App'x 879, 881 (11th Cir. 2005) ("[A]n error cannot meet the 'plain' requirement of the plain error rule unless it is 'clear under current law.' . . . [W]here neither the Supreme Court nor this Court has ever resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue." (quoting *United States v. Aguillard,* 217 F.3d 1319, 1321 (11th Cir.2000)); *United States v. Delgado-Montoya*, 663 F. App'x 719, 722 (10th Cir. 2016) ("If neither the Supreme Court nor the Tenth Circuit has ruled on the subject, we cannot find plain error if the authority in other circuits is split." (quoting *United States v. Teague*, 443 F.3d 1310, 1319 (10th Cir. 2006))).

circuits.[61]  But just because *Johnson* relied on division in federal courts, it does not mean

that division in other courts is irrelevant or unpersuasive in the issue of "plainness."  This

is especially the case where (as we shall see here) even federal courts offer little to no

guidance on an issue.  Therefore, we read *Johnson* to also support the more general

proposition that there may be no plain error where there is no binding authority on an issue

and where persuasive authority is divided, because in these circumstances, the answer is

unclear.

The principle set forth in *Johnson* describes the situation in Johns' case.  After a

careful review, we find that neither the United States Supreme Court[62] nor this Court (nor

any other court in Delaware) has definitively ruled on the admissibility of information

originating from NCIC records, either in the context of hearsay or in the context of the

Sixth Amendment.[63]  With respect to hearsay, courts in other jurisdictions are divided on

---

[61] The issue in *Johnson* was the admissibility of drug courier profile evidence.  *See Johnson*, 813 A.2d at 165-66.

[62] We did not find any cases from the United States Supreme Court which spoke of the NCIC in a hearsay or confrontation clause context.  *See Arizona v. Evans,* 514 U.S. 1, 26-27 (1995) (Ginsburg, J., dissenting) (arguing the exclusionary rule should extend to information gathered in violation of the Fourth Amendment due to clerical errors, and using the NCIC as a theoretical example to illustrate how clerical errors can have an appreciable impact on a suspect's Fourth Amendment rights); *Herring v. United States*, 555 U.S. 135, 155 (2009) (Ginsburg, J., dissenting) (using the NCIC as a theoretical example to illustrate the same point as in *Evans*, *supra*.); *Baker v. McCollan* 443 U.S. 137, 156 n.20 (1979) (Stevens, J., dissenting) (evaluating a due process issue, and mentioning the NCIC in a footnote as an example of a database law enforcement uses for identification); *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 401 (1997) (evaluating an issue unrelated to hearsay or the confrontation clause, and only mentioning the NCIC in the course of building narrative and factual background); *Arizona v. Hicks*, 480, U.S. 321, 332 (1987) (Powell, J., dissenting) (same); *Doggett v. U.S.*, 505 U.S. 647, 649 (1992) (same).

[63] Briefing by the parties and this Court's research revealed only two cases in Delaware which mention the NCIC:  *Ruffin v. State*, 131 A.3d 295, 299 (Del. 2015), and *State v. Humble*, 2001 WL 1555939, at *2 (Del. Com. Pl. Jun. 20, 2001).  In *Ruffin,* the alleged hearsay did not concern the NCIC, it concerned a trace report from the Bureau of Alcohol, Tobacco, Firearms and Explosives.

the question. Limited Delaware authority suggests that the Court examines public records for certain indicia of trustworthiness to determine admissibility,[64] but here, there is nothing in the record before us allowing us to make any such determination. And in terms of the Confrontation Clause, the answer is also unclear. Consequently, as we explain below, the Superior Court did not err in failing to exclude the evidence and is **AFFIRMED** on these issues.

### 1. Plain Error and Exclusion on Grounds of Hearsay

The Superior Court did not err by not excluding the NCIC testimony *sua sponte* on hearsay grounds because it is unclear whether information from NCIC records is admissible under a hearsay exception.[65] The plain error standard of review requires that

---

*Id*. at 297. Our Court observed that the ATF Report was not making a finding of fact. Rather it was "simply compiling data" and it "was not introduced into evidence to prove that Ruffin was in possession of a stolen firearm." *Id*. at 304. We further observed that "information from the NCIC, such as details on stolen property, comes from a national database very similar to the DELJIS database discussed in [*Hickson v. State*, 2003 WL 1857529 (Del. 2003)], and that Ruffin did not object to the detective's recital of his NCIC search which was the only evidence that affirmatively showed that the gun in question was stolen. *Id*. Thus, the challenged ATF report supported the charge of receiving a stolen firearm, but it was not, as Ruffin asserted, the only credible evidence that he knowingly received a stolen firearm. *Id*. In *State v. Humble*, a Court of Common Pleas case, the court found that the defendant could use information from the NCIC to question the reliability of evidence put forth by the State in defendant's sentencing, because that NCIC information met the court's standard of review by having more than the "minimum indicia of reliability." 2001 WL 1555939, at *3. The court so found because the NCIC's widespread use by law enforcement suggested that it was reliable. *Id*. The court did not speak of the NCIC in the context of hearsay other than to say that even if it were hearsay, it would be admissible in a sentencing proceeding. *Id.*

[64] *See, e.g., Ruffin*, 131 A.3d at 301, 303 ("[P]ublic records must be trustworthy to be admissible. . . . Trustworthiness can be established by showing that the public record was created by a legal duty. . . . The record reflects that information included in the ATF Report was gathered pursuant to a duty imposed by law.").

[65] We recognize that some of the cases addressed below contemplate admissibility under differing hearsay exceptions. However, under our facts, we, nonetheless, consider them relevant and instructive.

16

the challenged piece of evidence's inadmissibility be so "clear under current law,"[66] that the Superior Court ought to have excluded it *sua sponte*.[67]  But where neither this Court nor any other binding authority has ruled on an issue, and where other courts are divided, any purported error relating to that issue cannot be a plain one.[68]

Our Court has not ruled on whether information from NCIC records is admissible under any hearsay exception, and although not binding on us as to our State's hearsay rules, the United States Supreme Court has not ruled on the admissibility of NCIC information either.  Further, courts in other jurisdictions which might offer persuasive guidance are divided.

For example, in *United States v. Enterline*, the United States Court of Appeals for the Eighth Circuit held that a report from a computerized database, identifying vehicles as stolen and referenced at trial through an officer's testimony, was admissible under the federal equivalent of the D.R.E. 803(8) public records exception.[69]  NCIC information was admitted under the business records exception in *Frye v. Commonwealth*.  There, the defendant challenged the admissibility of an NCIC printout identifying him as wanted.[70]  However, the Supreme Court of Virginia held it to be admissible under the business records exception due to practical necessity combined with other indicia of reliability and

---

[66] *Johnson*, 813 A.2d at 165.

[67] *Morales*, 133 A.3d at 532 (quoting *Whittle*, 77 A.3d at 248).

[68] *Johnson*, 813 A.2d at 166.

[69] 894 F.2d 287, 289 (8th Cir. 1990) (determining admissibility under Fed. R. Evid. 803(8)(B)).

[70] *Frye v. Commonwealth*, 345 S.E.2d 267, 280 (Va. 1986).

trustworthiness, like the fact that the record was shown to be regularly prepared and routinely relied upon by the Virginia State Police in the regular course of business.[71]

By contrast, in *United States v. Hendricks*, the Eleventh Circuit upheld the admission an NCIC report in the context of a supervised release revocation proceeding (where the Federal Rules of Evidence do not apply),[72] but acknowledged that "an NCIC report is hearsay and does not fall within the Federal Business Records Act or any other recognized exception to the hearsay rule."[73]

Relatedly, in *State v. Torres*, a New Jersey court refused to admit information from an NCIC record under New Jersey's business records exception because the information's proponent failed to demonstrate that the database's sources were trustworthy.[74] Thus, based on these varying outcomes, it is apparent that the issue of the NCIC records falling into a hearsay exception is anything but clear or plain.

---

[71] *Id.*; *see also Cooper v. Commonwealth*, 680 S.E.2d 361, 368 (Va. Ct. App. 2009) (following *Frye* and holding that an NCIC report identifying defendant's shotgun as stolen was admissible under Virginia's business record exception); *State v. Sneed*, 709 S.E.2d 455, 457, 462 (N.C. Ct. App. 2011) (following *Frye* and holding that the admission, under the business record exception, of officer testimony citing an NCIC report identifying defendant's gun as stolen was not plain error).

[72] In *Hendricks*, the information from the NCIC record was admissible because the Federal Rules of Evidence do not apply in supervised release revocation proceedings. *United States v. Hendricks*, 143 F.App'x 168, 171 (11th Cir. 2005).

[73] *Id.* at 172; *see also United States v. Long*, 578 F.2d 579, 581 (5th Cir. 1978) (citing *United States v. Johnson*, 413 F.2d 1396, 1398 (5th Cir. 1969)) (same but also declining to reverse the conviction on that ground because the officer's testimony as to the contents of the report was not prejudicial since it had not been admitted as direct evidence of a necessary element of the crime and in view of the plethora of other evidence that the truck had been stolen); *Castillo-Salgado v. State*, 2014 WL 3764492, at *3 (Tex. App. Jul. 30, 2014) (finding no predicate for the admission of information from an NCIC record through an exception to the hearsay rule).

[74] 2022 WL 244121, at *6-7 (N.J. Super. Ct. App. Div. Jan. 27, 2022).

We observe that the court in *Torres* did not definitively determine that the information from the NCIC record was, *per se*, inadmissible under New Jersey's business records exception. Other New Jersey cases suggest that NCIC records "might" be admissible under the exception if certain criteria establishing the trustworthiness of the information were met.[75] Ultimately, the court in *Torres* excluded the evidence because of insufficient information to evaluate that criteria.[76] Other jurisdictions have faced similar informational challenges.[77] This Court does as well. We, like them, have virtually no information in the record about the NCIC and its database.

Indeed, it might be possible that NCIC records fit within one of Delaware's hearsay exceptions — perhaps even the public records exception in D.R.E. 803(8) as the State contends. But statements satisfy hearsay exceptions because certain circumstances under which they are made indicate their trustworthiness. Here, the record before us lacks information about the trustworthiness of the challenged statements.[78] Therefore, for these

---

[75] *Torres*, 2022 WL 244121, at *6. In a predecessor case to *Torres*, *State v. McGee*, the New Jersey Superior Court suggested that an NCIC report might be admissible if its proponent established "(a) how and when the information furnished by the owner ... was passed ... to the ... police; (b) how and who fed the information into the computer; (c) who programmed the computer and how it was done; how the data was retrieved from the computer; the accuracy of those who operated the computer." *State v. McGee*, 329 A.2d 581, 584 (N.J. Super. Ct. App. Div. 1974); *see also State v. Underwood*, 668 A.2d 447, 452 (N.J. Super. Ct. App. Div. 1995) (determining that because the NCIC information came from an anonymous caller, the State could not establish who reported the car as stolen and, thus, it was error to admit the officer's testimony that the car was identified in the NCIC computer as stolen, but also determining that the error was harmless because other evidence established that the car had been reported stolen).

[76] *Id.* at *7.

[77] *See Castillo-Salgado*, 2014 WL 3764492, at *3 (noting no predicate for the admission of an NCIC report could be found based on its "brief description" in the record).

[78] Our analysis of issues raised on appeal is limited to reviewing facts that appear on the record. *See* Supr. Ct. R. 9(a) ("An appeal shall be heard on the original papers and exhibits which shall

19

reasons, we hold that the Superior Court did not commit plain error by not excluding the information from the NCIC *sua sponte* on grounds that it "plainly" constituted inadmissible hearsay.

### 2. *Plain Error and the Confrontation Clause*

The Superior Court did not plainly err when it did not exclude the information derived from the NCIC records on Confrontation Clause grounds because there is virtually no case law directly addressing whether such information is testimonial in nature. Further, what general Confrontation Clause guidance is available still leaves the answer unclear.

In the context of the Sixth Amendment's Confrontation Clause, trial statements which are "testimonial" in nature are not admissible unless the declarant is unavailable, and the defendant has had a prior opportunity to cross-examine him.[79] Although Johns did examine the officer who testified about the NCIC information, Johns did not cross-examine a representative from the NCIC at any point, so the question, therefore, is whether the information from the NCIC is testimonial. If not, then its inclusion does not run afoul of Johns' Sixth Amendment rights.

As discussed above, an error cannot be plain if neither this Court nor any other binding authority (which in this matter includes the United States Supreme Court) has definitively ruled on the issue, and if other courts are divided. The question of whether information from an NCIC record is testimonial is even more unclear than the question of

---

constitute the record on appeal."); *Tricoche v. State*, 525 A.2d 151, 154 (Del. 1987) ("This Court can only evaluate issues raised on appeal by reviewing the facts that actually appear in the record").

[79] *Crawford v. Washington* 541 U.S. 36, 59 (2004).

whether it is inadmissible hearsay.  This issue remains unaddressed by this Court and the United States Supreme Court, and courts in other jurisdictions have not addressed it either.

One exception is *State v. Carrion*, where the Supreme Court of New Jersey analyzed a confrontation issue in the context of its state firearm permit database.[80] *Carrion's* analysis suggests that Sixth Amendment concerns do not arise from the raw database information itself, but rather from circumstances where the witness who retrieves and relays the information is not available to testify.[81]  In *Carrion*, the defendant contended that the trial court erred in admitting information contained in an affidavit from a non-testifying detective of the Firearms Investigation Unit of the Department of Law and Public Safety.  The admitted evidence showed that the detective's search of the state's database revealed that no permit existed authorizing defendant to lawfully possess a handgun.  The court held that although the raw data contained in the database listing issued firearm permits was not "testimonial" itself, the affidavit, which contained statements about the *search* of that database for information specific to defendant for use in his prosecution, was testimonial.[82]  Thus, with the affiant unavailable, the State's use (over defendant's objection) of that affidavit violated the defendant's confrontation rights.

---

[80] *State v. Carrion* 265 A.3d 115, 119 (N.J. 2021).

[81] *See id.* at 126 ("The upshot of all this is that a witness was required to explain the accuracy of the information entered into the database search for the existence of a firearm permit issued to Carrion, but no such witness was presented.  With only the affidavit, and with no opportunity to question the officer knowledgeable about how the search of the database was performed, Carrion could not explore whether the officer used the correct date of birth, name, or other identifying information such as a social security number in order to generate a correct search of the database, and what information that search produced.").

[82] *Id.* at 126.

Other than *Carrion*, our research turned up no other case law addressing the matter in any direct or meaningful way,[83] much less a division among multiple courts discussing the issue. As discussed above, the principles set forth in *Johnson* are not the only way to show a matter is not plain. It is not unreasonable to assume that a complete dearth of authority is just as effective in demonstrating that a matter is not plain as a division among courts is.

Further, the facts in Johns' case are distinguishable from those in *Carrion*. Here, unlike *Carrion*, the officer (Detective Rosaio) *did* testify about the NCIC information. Although Carrion, could be read to suggest this difference obviates any Confrontation Clause issues (the raw data being non-testimonial),[84] such as conclusion would only be by inference and is anything but clear.

Moreover, the uncertainty of the NCIC information's testimonial nature is further illustrated by general jurisprudence that our Court has developed concerning the Confrontation Clause in other contexts following the United States Supreme Court's landmark decision on the Confrontation Clause in *Crawford v. Washington*.[85] In

---

[83] A search of other jurisdictions uncovered little more than multiple cases where the issue was raised but was not reached due to resolution on other grounds. *See Hendricks*, 143 F. App'x at 172 (not addressing the issue since defendant failed to develop the argument on appeal); *Casas v. State* 2014 WL 1633122, at \*5 (Tex. App. Apr. 24, 2014) (not addressing the issue because defendant's claim was overruled under Texas law due to failure to preserve); *United States v. Estrada*, 261 F. App'x 203, 207 (11th Cir. 2008) (not addressing the issue since the NCIC information was not introduced for the truth of the matter asserted). We do not claim that *no* other case law exists on the matter, or that our inquiry was unassailably exhaustive. But the parties have cited no case squarely addressing the issue, and we have similarly found none.

[84] *Carrion*, 265 A.3d at 126.

[85] *Crawford*, 541 U.S. at 68.

*Crawford*, the United States Supreme Court declined to define a "testimonial statement," identifying instead several factual situations which comprised "core" testimonial statements, and leaving for courts in the future to define its contours.[86]

Following the guidance set forth in *Crawford*, our Court, in *Chavis v. State*, conducted a careful analysis of testimonial statements in the context of forensic evidence.[87] In *Chavis* several non-testifying DNA analysts worked on constituent stages of a forensic DNA analysis process.[88] Ultimately, a testifying analyst combined and interpreted the outcomes of the non-testifying analysts' work into a form that could be, and was, used against the defendant at trial.[89] The defendant challenged the testifying analyst's statement, saying he (the defendant) was not afforded the opportunity to face the non-testifying analysts who conducted the earlier constituent stages of work which were later synthesized into the final report.[90]

Despite the challenges posed by the record before it, which did not include the lab's case files, our Court held that the out-of-court statements in the entries written by analysts who did not appear at trial were not "testimonial" within the meaning of controlling United

---

[86] *Id.* at 51-52. The Court explained that things like extra judicial statements such as affidavits, depositions, prior testimony, police interrogations, or "statements that were made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for later use at trial" all qualified as testimonial. *Id.*

[87] 227 A.3d 1079 (Del. 2020).

[88] *Id.* at 1081.

[89] *Id.* at 1086.

[90] *Id.* at 1087.

23

States Supreme Court precedent.[91] We so held because a trilogy of federal cases had indicated that a statement is testimonial when "the purpose of the statement is proving an essential element of the crime."[92] In Chavis' case, the purpose of the analysts' statements in the case files was not to provide evidence against Chavis, and they "did not serve as a substitute for in-court testimony [which tended] to prove an essential element of the crime."[93] In fact, these intermediary statements "did not themselves prove — or aim to prove — anything."[94]

Our conclusion was supported by our review of caselaw from other states. These cases suggested to us that analysts who only manipulate the DNA sample and who state that they have followed standard operating procedures in doing so are not making testimonial statements.[95] The statements in *Chavis* almost undisputedly pertained only to whether standard operating procedures were followed and how DNA swabs might have

---

[91] *Id.* at 1088, 1093.

[92] *Id.* at 1091.

[93] *Chavis*, 227 A.3d. at 1092 (emphasis added); *see also id* at 1088; *id* at 1093 ("[a]lthough the DNA profile that was the end result of all the analysts' combined work was offered to prove the identity of the burglar . . . the intermediary steps taken do not themselves prove—or aim to prove—anything.").

[94] *Id.*

[95] *Id.*

been examined.[96] This evidence "did not provide testimony *against* Chavis"[97] and was, therefore, not testimonial.

In the case at hand, the information from the NCIC *was* used against Johns. In fact, it was critical to his conviction because it established the essential element that the firearm was stolen. Indeed, one could infer from *Chavis* that the information from the NCIC record here is testimonial for this very reason. But it is still not completely apparent. Our facts differ from *Chavis*. In *Chavis*, the challenged statements were created for the purpose of Chavis' trial but were not used "against" him given that they addressed matters such as compliance with standard operating procedures. The reverse is likely true for Johns. In other words, the information likely was not created for the purpose of being used in his trial, but it was ultimately used in his trial to establish an essential element of the offense for which he was convicted.[98]

---

[96] *Id.* at 1091 ("Even Chavis only posits that the non-testifying analysts' statements relate to their adherence to testing protocols and the absence of irregularities (following standard operating procedures and not seeing any evidence of taint or contamination)—he does not argue that those statements in and of themselves were used to prove his identity or any other element of the crimes he was charged with.").

[97] *Id.* at 1093 (emphasis in original).

[98] Under *Chavis'* facts, this distinction was not of great importance since we determined the analysts' statements were not used against Chavis. This foreclosed the need to evaluate the purpose of the statements' creation. But in *Michigan v. Bryant*, cited by the State in its briefing and referenced in *Chavis*, the statement's primary purpose was the chief concern. There, the Supreme Court of the United States held that a statement was not testimonial in the context of a police interrogation where the primary purpose of the interrogation is to "respond to an 'ongoing emergency [and] not to create a record for trial[.]" 562 U.S. 344, 358 (2011). The Court in *Bryant* clarified when exactly a police interrogation was in response to an ongoing emergency and found that the statements at issue were elicited for that primary purpose. *Id*. at 377-78. *Bryant's* analysis suggests that the purpose for which a statement is elicited or made is important; if the statement's ultimate *use* against the defendant at trial was the only relevant factor in determining testimonial nature, then *Bryant's* discussion of purpose would have been pointless (there the statements were clearly used against *Bryant* at trial). In fact, *Bryant* demonstrates that there can be circumstances

25

Moreover, we are now faced with two arguably differing inferences. On the one hand, we have a New Jersey case, *Carrion,* which could be read to imply that the NCIC information *is not* testimonial. On the other hand, we have a case from *our* Court, that provides clarification on more general law while dealing with different facts and evidence, but that could be read to suggest that NCIC information *is* testimonial. The bottom line is that this state of affairs does not render the answer to the Confrontation Clause question "apparent on the face of the record."[99]

Finally, we note that neither of the parties cited to nor discussed *Carrion* or *Chavis* in their briefing. This fact, combined with Johns' failure to present this issue below, gives us great pause about rendering constitutional pronouncements on such important issues. As a result, nothing in our opinion should be construed as a suggestion on how we would rule on these issues on the merits in a subsequent case. Instead, it suffices for now that we reject Johns' claim that the Superior Court plainly erred by not excluding the challenged testimony on Confrontation Clause grounds.

### B. *The Superior Court Did Not Err in Denying Johns Motion to Suppress for Lack of Probable Cause.*

The Superior Court did not err in finding that the underlying affidavit provided sufficient probable cause for a magistrate to issue a warrant for the search of 514 because

---

where a statement can be used "*against*" a defendant at trial, as *Chavis* framed it, yet *not* be testimonial. Even so, the extent to which *Bryant's* analysis and holding are applicable outside of *Bryant's* own facts--which arose in the context of police interrogation—is unclear. What is more, the record before us contains no information about the origin of the information used against Johns, or the NCIC's purpose in recording it.

[99] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

the totality of facts and circumstances alleged within the affidavit create a logical nexus between seizeable contraband and 514 West 6th Street.

Both the United States and Delaware Constitutions[100] guarantee individuals the right to be free from warrantless searches and seizures. [101] A warrant for the search of a place or person may only be issued upon a showing of probable cause, certified by oath or affirmation.[102] It is well-established that a warrant has been properly supported by probable cause when it passes the "four corners test," that is, that the facts and circumstances described within the "four corners" of the affidavit seeking the warrant would lead a "neutral judicial officer to form a reasonable belief that an offense has been committed and that seizeable property would be found in a particular place or on a particular person."[103]

---

[100] Although Johns mentions both the Delaware and Federal Constitutions in his briefing, he does not make more than a perfunctory argument that there is any material difference between the two on this issue. In his introductory paragraph on the issue, Johns asserts that the two constitutions are different and that the Delaware Constitution provides broader protection from search and seizure than the Federal Constitution, but the argument is not developed further beyond this single instance. *See* Second Corrected Opening Br. at 17.

[101] U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized"); Del. Const. art. I, § 6 ("The people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as particularly as may be; nor then, unless there be probable cause supported by oath or affirmation."); *Sisson v. State*, 903 A.2d 288, 296 (Del. 2006) (quoting *Fink v. State*, 817 A.2d 781, 786 (Del. 2003)).

[102] *Id.*; 11 *Del. C.* § 2306.

[103] *Dorsey v. State*, 761 A.2d 807, 811 (Del. 2000) (referring to the four corners test as a "time honored standard"); *Valentine v. State*, 207, A.3d 566, 570 (Del. 2019) ("it is well settled that any finding of probable cause must be based on the information that appears within the four corners of the application or affidavit."); *see, e.g., Hooks v. State*, 416 A.2d 189, 203 (Del. 1980); *Sisson*, 903 A.2d at 296; *LeGrande v. State*, 947 A.2d 1103, 1107-08 (Del. 2008); *State v. Holden*; 60 A.3d 1110, 1114 (Del. 2013); *Cooper v. State*, 228 A.3d 399, 405 (Del. 2020).

In other words, the facts contained within the affidavit must create a logical nexus between the items to be sought and the place to be searched.[104]

That said, it is important to clarify that the affidavit need not granularly piece together an unassailable connection between the contraband to be found and the place to find it. Indeed, this Court has specifically admonished against insisting on "elaborate specificity"[105] or a "hypertechnical analysis of [the underlying affidavit's] separate allegations."[106] Rather, a magistrate "may draw reasonable inferences from the factual allegations in the affidavit,"[107] and should use "practical, common-sense" judgment in her decision.[108] To that end, when evaluating the magistrate's determination under the Four Corners Test, although reviewing courts should not "simply rubber stamp a magistrate's

---

[104] *Hooks*, 416 A.2d at 203 ("Probable cause is established when a nexus between the items to be sought and the place to be searched appears.").

[105] *Holden*, 60 A.3d at 1114 ("Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965))). Indeed, the Supreme Court has cautioned against forgetting the deference owed to issuing magistrates by becoming too entangled in minute scrutiny of the underlying facts. *Id.* at 1115 ("The U.S. Supreme Court has also explained the danger of lowering the level of deference due warrants signed by neutral magistrates. 'If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches[.]'" (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983))).

[106] *Sisson*, 903 A.2d at 296; *Gardner v. State,* 567 A.2d 404, 409 (Del. 1989); *Holden*, 60 A.3d at 1114 ("[T]he Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." (quoting *Ventresca*, 380 U.S. at 108)).

[107] *Sisson*, 903 A.2d at 296.

[108] *Valentine*, 207 A.3d at 570 (quoting *Holden*, 60 A.3d at 1114).

28

conclusions[,]"[109] "great deference" is to be given to her decision, and the magistrate's finding should be evaluated without a "grudging or negative attitude."[110]

It is not uncommon for an underlying affidavit to utilize tips from informants to support probable cause. "A tip from a confidential informant can provide probable cause, if the totality of the circumstances demonstrates the tip's reliability[.]"[111] In determining this, "[a] magistrate must consider the reliability of the informant, the details contained in the informant's tip, and the degree to which the tip is corroborated by independent police surveillance and information."[112] Indeed, "if the informant's tip can be corroborated, the tip may establish probable cause, even where nothing is known about the informant's

---

[109] *Sisson*, 903 A.2d at 296 (quoting *United States v. Zimmerman*, 277 F.3d 426, 432 (3d. Cir. 2002)).

[110] *Holden*, 60 A.3d at 1114.

[111] *See id.* at 1115-16.

[112] *Id.* at 1114.

credibility."[113]  This is particularly the case where the tip accurately predicts a suspect's criminal activity.[114]

For example, in *State v. Holden*, informants tipped the police that the defendant was dealing drugs out of a particular residence.[115]  Based on these tips, police subsequently surveilled the defendant's residence, and conducted a traffic stop on a driver who departed the site after a brief meeting with the defendant.  The driver possessed illegal narcotics, and although the driver never identified the defendant as the source, the driver acted

---

[113] *Cooper v. State*, 228 A.3d 399 (Del. 2020) (internal quotation marks omitted) (quoting *Tolson v. State*, 900 A.2d 639, 643 (Del. 2006) (also finding under its facts of warrantless arrest that probable cause existed when an unknown informant accurately predicted where the defendant's drug deal would take place and how the defendant would conduct it)); *Holden*, 60 A.3d at 1114; *Cooper v. State*, 32 A.3d 988, 2011 WL 6039613, at *5-6 (Del. Dec. 5, 2011) (TABLE) (finding in the context of warrantless arrest probable cause where an otherwise unverified confidential informant accurately predicted the defendant's appearance, vehicle, illegal activity of selling heroin, and location for an upcoming transaction); *Tatman v. State* 494 A.2d at 1251 (finding, in the context of the Automobile Exception, probable cause notwithstanding an unknown informant, where police investigation corroborated the tip.); *State v. Taylor*, 2025 WL 24801, at *4 (Del. Super. Ct. Jan. 2, 2025) ("Even if nothing is known about the reliability of an informant, the informant's tip can form the basis for probable cause if sufficiently corroborated.").

[114] *Id.* at 1109; *see Taylor*, 2025 WL 24801, at *4 ("Delaware Courts have historically distinguished between two forms of corroboration:  corroboration of a defendant's identity and corroboration of criminality. The latter, but not the former, supports probable cause."); *Holden*, 60 A.3d at 1116 (considering information in an informant's tip and finding probable cause where the criminal activity alleged therein was corroborated by a police traffic stop, illustrated *infra*); *cf. LeGrande*, 947 A.2d at 1111 ("Since there was no corroboration by independent police work of the anonymous tipster's assertion of illegality, . . .  the totality of the circumstances did not provide the issuing magistrate a substantial basis for concluding there was probable cause that evidence or contraband would be found on the premises."); *Valentine v. State*, 207 A.3d 566, 577 (Del. 2019) (finding no probable cause after finding it unreasonable to consider a confidential informant's tip for lack of indicia of reliability, and noting that "the police surveillance uncovered no facts relevant to or corroborative of the informant's tip save Valentine's association with the Broom Street apartment, and gave a neutral, independent fact-finder no additional reason to think that there was probable cause to believe that there would be contraband in Valentine's home or car.").

[115] 60 A.3d at 1112.

suspiciously and was discovered to be carrying the very same type of illegal narcotics the tip alleged the defendant dealt from the named residence.  Based on the tips, the driver's possession of narcotics, and the fact that police had just seen the driver depart from the defendant's residence, police obtained a warrant to search the residence and discovered contraband inside.  The defendant successfully challenged the warrant on the basis of lack of probable cause.  The Superior Court determined the confidential informants' tips to be too unreliable to have been considered.  It took issue with the fact that the informants never bought drugs from the defendant themselves, that there was no way to conclusively determine that the driver had acquired the narcotics from the defendant's house, that the information informants provided about defendant's house and car could have been provided by any neighbor, and that subsequent police investigation never revealed the normal trappings of drug activity like high foot traffic.

This Court reversed the decision.  We held that the additional missing information the Superior Court believed necessary to find probable cause was not required considering that the magistrate's task was simply to make a common-sense inference.  The police corroboration that had taken place was enough.  Police saw the stopped driver coming from the defendant's home, and he possessed the same type of narcotics mentioned in the tip.  This "justified a reasonable inference that a delivery of drugs had occurred" and that police could find drugs at the defendant's house.[116]  In other words, the tip was corroborated to

---

[116] *Id.* at 1116.

the extent that it alleged the defendant was perpetrating a certain crime from a certain place and was, therefore, sufficient to support a finding of probable cause.

Turning to the case at hand, we see several similarities to *Holden*. We hold that the Superior Court did not err in determining that the totality of the circumstances here was sufficient for a reasonable magistrate to find probable cause that evidence of drug dealing could be found at 514. For the purposes of this analysis, this Court, like the Superior Court below, will assume, *arguendo*, that the anonymous tips from 2021 are impermissibly stale.[117] In any case, we also believe those tips are not necessary for a finding of probable cause,[118] and our analysis will focus on the July, 2022 tip and the subsequent police investigative work.

Starting with the July, 2022 tip, an anonymous tipster mentioned that Johns was "hiding firearms and selling large quantities of marijuana and other illegal substances out of 514" and that Johns facilitated these "transactions by means of his un-licensed barbershop, which he operate[d] out of [the same address]."[119] Taken alone, this tip was insufficient to establish probable cause since (as Johns asserts) there was no basis to conclude that the anonymous tipster was credible. However, the magistrate could still utilize it in the probable cause analysis because the tip's information concerning the criminal activity at 514 was corroborated by subsequent police investigative work.

---

[117] *State v. Johns*, 2023 WL 3750432, at *2 (Del Super Ct. May 31, 2023).

[118] *Id*. at *2-3 (finding that, even without the August 2021 tip, the July 2022 tips combined with independent police investigation were enough to support probable cause).

[119] B17 (Aff. ¶ 5).

32

On two subsequent occasions, police investigation turned up evidence which connected illegal drugs to Johns and 514. First, during surveillance of 514 occurring during the first week of August 2022, DOCV officers observed a suspicious, doorway interaction between Johns and an individual, whereafter a subsequent traffic stop revealed that the individual was in possession of marijuana.[120] The individual claimed to have purchased the drugs from a friend he knew from "cutting hair."[121]

Then, on August 11, 2022, DOCV officers were once again surveilling 514 and witnessed a man, later identified as Charles Webster, enter the residence, exit an hour later, and drive away. Once more, police conducted a traffic stop and observed a nervous, distracted, heavily-breathing Webster, who refused to exit the vehicle when ordered while expressing a fear of being searched.[122] He then sped off.

Both observations either directly, or through common sense and reasonable inference, corroborate the July tip's claim that Johns was selling marijuana from 514. The early August stop of the unnamed individual forged a connection between 514 and the acquisition of marijuana because the individual was found in possession of the substance after observably departing from the address. Then both the reliability of the tip and the 514 connection were strengthened when the individual described purchasing the marijuana from a friend who cut hair, when it was known from the tip that Johns dealt drugs by means of his unlicensed barbershop located inside of 514.

---

[120] B18 (Aff. ¶ 7).

[121] *Id.*

[122] B18 (Aff. ¶ 9).

Then, the August 11th traffic stop fortified the connection further when Webster acted suspiciously, expressed fear of being searched, and ultimately fled from police directly following a visit to 514. Webster's behavior also supports a reasonable inference that Webster acquired something at 514 he did not want police to find. Based on these facts, taken in their totality, a magistrate could reasonably conclude that illegal drug dealing was occurring inside 514, that evidence of this activity could be found there, and that probable cause existed for the issuance of a warrant.

Johns poses a few counterarguments which we find unavailing. First, Johns argues that the July 2022 tip was only corroborated to the extent that it identified him and that it did not predict his criminal behavior. This is simply not the case. The July tip stated that Johns was "selling large quantities of marijuana" out of "514 West 6th Street[.]"[123] For the reasons discussed above, the August traffic stops supported the tip's assertion in this respect.[124] Thus, this argument fails.

Johns also argues that the July 2022 tip alleged certain activities which were never explicitly corroborated. A finding of probable cause does not require this level of exactness. So long as police work corroborates the facts in the tip which *are* needed for

---

[123] B17 (Aff. ¶ 5).

[124] *See Holden*, 60, A.3d at 1116 (rejecting the argument that an anonymous tip did no more than identify the defendant, and finding the tip was adequately corroborated, where police observed a driver leave from defendant's house, stopped the driver, and subsequently found the predicted types of contraband).

probable cause under the circumstances, a magistrate may find it "even though a portion of one of the informants' tip[s] was not corroborated."[125]

Next, Johns argues that police surveillance failed to turn up *other* evidence, not alleged in the tip, which is typically indicative of drug dealing – for example, that the sales did not seem regular, that there were no controlled buys, and that there was no foot traffic to the premises. The defendant in *Holden* made a similar argument and even cited the absence of similar facts,[126] but our Court rejected that argument and stated that "a template of 'typical' facts is not the *sine qua non* for a finding of probable cause[.]"[127]

Finally, Johns attacks the value of the statements from the stopped drivers observed coming from 514. Johns alleges a myriad of shortcomings: for example, how the drivers did not sufficiently identify Johns, or talk about past dealings with him, or speak of the logistics of their purchase, or what their criminal records might have been. This argument also fails because it demands the kind of "elaborate specificity" that this court has eschewed.[128] Johns does not give the "well established 'great deference'" owed to the magistrate, who is simply tasked with using "practical, common-sense"[129] and making "reasonable inferences from the factual allegations in the affidavit."[130]

---

[125] *Holden*, 60, A.3d at 1116.

[126] *Holden*, 60, A.3d at 1116 (observing that the Superior Court erred in focusing on the fact that "the officers did not observe a high level of foot traffic, 'typically' associated with drug dealing[,]" or conduct a controlled buy).

[127] *Id.* at 1116.

[128] *Holden*, 60 A.3d at 1114 (quoting *Ventresca,* 380 U.S. at 108).

[129] *Id.*

[130] *Sisson*, 903 A.2d at 296.

Here, the magistrate was presented with a July 2022 tip claiming that Johns was selling marijuana from 514 where he also operated an unlicensed barber shop. The magistrate then read that police stopped an individual with marijuana in his possession, whom the police *just* watched leave 514, and that this individual claimed to have purchased the marijuana from his hair-cutting friend. Finally, the magistrate read that yet another individual coming from the very same place nervously refused a search and fled from police immediately after his visit.

With these facts and circumstances, it is hard to argue that that there is no logical nexus between 514 and Johns' alleged drug dealing or that a magistrate could not reasonably make such a connection in exercising common sense and by drawing reasonable inferences. The pertinent information in the tip describing the nature of Johns criminal activity was corroborated, so it was reasonable for the magistrate to consider that information in her probable cause analysis. And even without the tip itself, after subsequent investigation, police still witnessed two individuals leave 514 with either drugs in their possession, or behavior suggesting possession of something they did not want police to find. Because of that, we find that the Superior Court did not abuse its discretion in holding that the magistrate had sufficient facts to find probable cause. For that reason, we **AFFIRM** the decision of the Superior Court on this issue.

> ### C. Title 11 § 1448 of the Delaware Code is Not Plainly Unconstitutional on its Face, and the Record is Too Undeveloped to Resolve Johns' As-Applied Challenge.

Because the Superior Court plainly could have envisioned a constitutional application of 11 *Del. C.* § 1448 (hereinafter, "Section 1448"), it did not commit plain error

36

when it did not hold, *sua sponte,* that the statute is facially unconstitutional.  Further, this Court cannot answer the question of whether Section 1448 is unconstitutional as applied to Johns because the record is not sufficiently developed.

In general, a statute is presumed constitutional unless a challenger can show clear and convincing evidence to the contrary.[131]  When evaluating the constitutionality of a statute, this Court shows deference to the legislature, and "[a]ll reasonable doubts as to the validity of a law must be resolved in favor of the constitutionality of the legislation."[132]

A constitutional challenge to a statute can take two forms:  (1) that the statute is facially unconstitutional, or (2) that it is unconstitutional as applied.[133]  Johns argues both. We turn first to the facial challenge.  A facial challenge to a statute is a "heavy burden" and "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [statute] would be valid."[134]  Thus, to rebut a facial challenge, the State need only show that a statute is constitutional in some of its applications.[135]  Moreover, in this case, where no argument of unconstitutionality was raised below, Johns' burden is compounded by the plain error standard of review, which requires that an error be so "clearly prejudicial to substantial rights"[136] that the Superior

---

[131] *Schnell v. Dep't of Servs. for Child., Youth & Their Fams.*, 338 A.3d 1279, 1286 (Del. 2025).

[132] *Albence v. Higgin*, 295 A.3d 1065, 1088 (Del. 2022) (alteration in original) (quoting *Hoover v. State*, 958 A.2d 816, 821 (Del. 2008)).

[133] *Schnell*, 338 A.3d at 1286.

[134] *United States v. Salerno*, 481 U.S. 739, 745 (1987).

[135] *United States v. Rahimi,* 602 U.S. 680, 693 (2024).

[136] *Wainwright*, 504 A.2d at 1100.

Court ought to have ruled on the issue *sua sponte*.[137] Given these hurdles, Johns' assertion of facial unconstitutionality easily fails.

Indeed, it is not difficult for this Court to envision a constitutional application of Section 1448. Although Supreme Court opinions like *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*[138] and *United States v. Rahimi*[139] recently modified and clarified Second Amendment jurisprudence set forth in *D.C. v. Heller*[140] and *McDonald v. City of Chicago, Ill*,[141] *Bruen* and *Rahimi* strongly suggest that there are constitutional applications of Section 1448. This is because, under those cases, a statute could constitutionally disarm individuals who "pose a credible threat to the physical safety of others."[142] Because our

---

[137] *Morales*, 133 A.3d at 532 (quoting *Whittle*, 77 A.3d at 248); *See supra* part III(a) (discussing in detail the plain error standard of review).

[138] 597 U.S. 1 (2022). *Bruen* supplanted the former Second Amendment analysis characterized by a two-step framework combining history with means-ends scrutiny. Under *Bruen*, the first inquiry is whether the Second Amendment's plain text covers the individual's conduct (which is presumably being affected in some way by the challenged statute/regulation). *Id*. If the answer is yes, then the conduct is presumed to be protected. *Id*. The burden then shifts to the government to "demonstrate that the regulation [at issue] is consistent with this Nation's historical tradition of firearm regulation." *Id*.

[139] 602 U.S. 680 (2024). *Rahimi* further explained and refined the principles set forth in *Bruen* and applied them to facts concerning a federal felon-in-possession statute disarming individuals with domestic violence restraining orders against them who are found to pose a threat to the person protected. *Id*. at 684.

[140] 554 U.S. 570 (2008).

[141] 561 U.S. 742 (2010).

[142] *Rahimi*, 602 U.S. at 700 ("we have no trouble concluding that Section 922(g)(8) survives Rahimi's facial challenge. Our tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others."). Of course, there are differences between 11 *Del. C.* § 1448 and the federal statute analyzed in *Rahimi* (18 U.S.C. § 922(g)(8)(C)(i), which concerned disarming individuals subject to domestic abuse restraining orders). We need not painstakingly analyze these differences in order for us to comfortably conclude that there was no plain error here.

focus is on plain error, we decline to engage in an exhaustive merits-based analysis. Even so, we see several bases for concluding that the Superior Court did not err in declining to, *sua sponte*, declare Section 1448 facially invalid. [143]

First, neither *Rahimi* nor *Bruen* purported to overturn *Heller*. They merely clarified the proper application of *Heller*.[144] Therefore, pronouncements in *Heller* are still authoritative and *Heller* prominently states that "nothing in [it] should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]"[145] This very pronouncement is referenced and supported by six of the nine justices in *Bruen*.[146] In addition, the United States Court of Appeals for the Third Circuit has specifically suggested that circumstances exist where individuals with drug-related felony

---

[143] *Dir. of Revenue v. Verisign, Inc.*, 267 A.3d 371, 377 (Del. 2021) ("It is the settled policy of this Court that a constitutional question will not be decided unless its determination is essential to the disposition of the case." (alteration removed) (quoting *Downs v. Jacobs*, 272 A.2d 706, 708 (Del. 1970))). Here, we do not need to reach the issue of 11 *Del. C.* § 1448's constitutionality on its merits as we can resolve the question based on the plain error standard of review.

[144] *See Bruen*, 597 U.S. at 17 (declining to adopt the two-part test which coalesced in Courts of Appeals in response to *Heller*, but framing its clarified jurisprudence as "keeping with *Heller*[.]"); *Rahimi*, 602 U.S. at 691 (expanding upon *Heller* and *Bruen*).

[145] *Heller*, 554 U.S. at 626; *see also McDonald*, 561 U.S. at 786 (repeating the same assurances from *Heller*).

[146] *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (stating that the Second Amendment still "allows for a 'variety' of gun regulations." including felon-in-possession statutes. (quoting *Heller*, 554 U.S. at 625) in so stating, Justice Kavanaugh specifically referred to felon in posession statutes referenced in *Heller*; *see also id.* at 72 (Alito, J., concurring) (observing that *Bruen* had not disturbed anything [the United States Supreme Court had] said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742 . . . (2010), "about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 130 (Breyer, J., dissenting joined by Sotomayor and Kagan, JJ.) ("[l]ike Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on [the] aspect of *Heller*'s holding" stating that statutes prohibiting felons from possessing firearms are presumptively lawful); *see also Rahimi*, 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n. 26).

offenses, like Johns, may pose a credible threat to the physical safety of others.[147]  In that respect, it may be possible that Johns' own circumstances stand as an example of a constitutional application of Section 1448.  Finally, the previous version of Section 1448 has been upheld by this Court,[148] and the current version has been upheld under our Delaware Constitution.[149]  These observations demonstrate that any purported facial invalidity of Section 1448 is, at a minimum, not "plain."

Finally, we note that Johns relies upon *Range v. Att'y Gen. United States,* (hereinafter *Range II*) in support of his argument of the facial unconstitutionality of felon-in-possession statutes.[150]  There, however, the United States Court of Appeals for the Third Circuit found 18 U.S.C. § 922(g)(1) unconstitutional "only as applied to [Range]" given the facts of his particular violation, and emphasized that its decision was "a narrow one."[151]  Thus, we find Johns' reliance on *Range II* in his facial challenge unavailing.

Therefore, for the reasons above, we **AFFIRM** the Superior Court on this matter.

---

[147] *See Pitsilides v. Barr*, 128 F.4th 203, 212-13 (3d Cir. 2025) ("And contrary to Pitsilides' constricted view of what makes a person a sufficient danger to remain disarmed, both history and common sense reflect that this 'dangerousness' includes not only direct involvement in physical violence.  For instance, 'though residential burglary and *drug dealing* are not necessarily violent, they are dangerous because they often lead to violence.'" (emphasis added) (quoting *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 922 (3d Cir. 2020) (Bibas, J., dissenting))).

[148] *See State v. Robinson*, 251 A.2d 552, 554 (Del. 1969).  We acknowledge that *Robinson* was decided before the recent jurisprudence in *Rahimi* and *Bruen* and dealt with a constitutional challenge based on vagueness.  *Id.*

[149] *Short v. State*, 586 A.2d 1203, 1991 WL 12101, at *1-2 (Del. Jan. 14, 1991) (TABLE).  *Short* was, however, decided in 1991 before the decisions of *Rahimi* and *Bruen*.

[150] 124 F.4th 218 (3d Cir. 2024) ("*Range II*") *on remand from* 144 S. Ct. 2706 (2024).

[151] *Id.* at 232.

Turning then to the "as-applied" challenge, "[a] statute is unconstitutional as applied when the statute 'is not valid in the particular circumstances of the case.'"[152]  Thus, in arguing that Section 1448 is unconstitutional as applied, Johns asks this Court to conduct, in the first instance on appeal, an onerous and fact-specific inquiry to determine whether his particular circumstances make this presumably constitutional provision unconstitutional when applied to his unique and personal background.  However, Johns did not raise the issue of constitutionality below, and as a result, the record before us is fatally underdeveloped.  Not only do we not have the information necessary to evaluate an as-applied challenge for Johns, but neither did the Superior Court, and therefore, any error on its part (if one even occurred) is not a plain one.

The Third Circuit, in *Pitsilides v. Barr*,[153] recently engaged in a relevant and instructive analysis of an as-applied challenge in the wake of the substantial changes that recent Supreme Court opinions like *Bruen* and *Rahimi* have made to the Second Amendment landscape.  *Pitsilides* explains how *Rahimi* refined the jurisprudence of *Bruen*, finding that felon-in-possession statutes were constitutional under the Second Amendment where the individual disarmed "poses a clear threat of physical violence to another."[154]

---

[152] *Schnell*, 338 A.3d at 1286 (quoting *Del. Bd. of Med. Licensure & Discipline v. Grossinger*, 224 A.3d 939, 956 (Del. 2020)).

[153] *See* 128 F.4th 203 (3d Cir. 2025).  The Third Circuit decided *Pitsilides* after Johns' trial on April 4, 2024.  However, this Court may still consider it in determining plain error.  *Buckham v. State*, 185 A.3d 1, 19 (Del. 2018) ("we judge whether an error is apparent 'from the vantage point of the appellate court in reviewing the trial record, not whether it was apparent to the trial court in light of then-existing law.'" (quoting *Capano v. State*, 781 A.2d 556, 663 (Del. 2001))).

[154] *Pitsilides*, 128 F.4th at 209 (quoting *Rahimi*, 602 U.S. at 698).

Thus, while it is possible for a felon to seek a judgment declaring that a disarmament statute is unconstitutional as applied to him, "to grant such relief, the record must be sufficient for a court to make an individualized determination that the applicant does not presently pose the kind of danger envisioned by *Rahimi* and *Range II*."[155] Although some offenses may offer conclusive evidence that someone poses such a danger, in making this determination, the reviewing court must look to "more than just the nature of [the defendant's] prior felony[,]"[156] rather it "must consider all factors that bear on a felon's capacity to possess a firearm without posing such a danger[,]"[157] including "a convict's entire criminal history and post-conviction conduct indicative of dangerousness, along with his predicate offense and the conduct giving rise to that conviction[.]"[158]

In *Pitsilides*, the only information defendant provided was that he was convicted of the (generally) non-violent crime of bookmaking, and that he had sustained some related non-violent convictions later. But this small bit of information was insufficient for the Third Circuit to evaluate his as-applied challenge. Although gambling-related convictions may not be inherently violent, it was possible that the *defendant's* perpetration of them was. The answer depended on the particular context, circumstances, and details of his offense. But the context and circumstances were unknown to the court. Similarly, the record before us regarding Johns' criminal history is fatally undeveloped.

---

[155] *Id.* at 210.

[156] *Id* at 211.

[157] *Id.*

[158] *Id.* at 212.

Johns' citation of *Range II* for his as-applied challenge to Section 1448 fares no better than his reliance on it for his facial challenge. The facts and circumstances in *Range II* are easily distinguishable. First, in reaching its decision in *Range II*, the Third Circuit evaluated much of the critical background information concerning Range that we lack for Johns. Second, insofar as we *do* know about Johns' criminal history, Range's is notably different. Range's offense was making a false statement on an application for food stamps decades in the past.[159] Johns' record appears to be much different. Our record in this appeal does indicate that Johns was previously convicted of Drug Dealing-Aggravated Possession under a former version of 16 *Del. C.* § 4752(a), as well as another instance of PFBPP under Section 1448(e), which are both violent felonies.[160] The record also suggests other prior drug-dealing-related offenses over the course of thirty years.[161] Thus, the limited information we do have does not weigh in Johns' favor. Finally, several other courts have declined to follow *Range II* in the context of an as-applied challenge, which further diminishes its persuasive force here. [162]

---

[159] *Id.* 231.

[160] *See* B48-49 (Sentencing Letter).

[161] It is somewhat unclear form the record whether Johns has two, three, four, or five prior drug-related offenses. The State stated that this case is the "third time we've seen a conviction for drug-dealing-related offenses" from Johns, A693 (Excerpt of Sentencing Tr., Oct. 11, 2024 at 13:14-21), but shortly afterward, the court states that "Mr. Johns was convicted in 1998 of distribution of marijuana 2006; again in 2007. In 2010 convicted of maintaining a store for controlled substance. 2015 was the possession by a person prohibited. And at that time in connection with [the person prohibited conviction] there was [sic] 15 pounds of marijuana found[.]" A694 (Excerpt of Sentencing Tr., Oct. 11, 2024 at 14-15:20-4); Appellant's Reply Br. at 17.

[162] *See United States v. Duarte,* 137 F.4th 743, 748 (9th Cir. 2025) (declining to follow *Range II* in an as-applied challenge); *Browne v. Reynolds*, 150 F.4th 975, 979 (8th Cir. 2025) (same).

The bottom line is that given the dearth of information needed to analyze Johns' as-applied challenge,[163] we decline to address this issue on the merits. Nor was it plain error for the Superior Court to not *sua sponte* address an un-raised as-applied challenge to Section 1448. Therefore, we **AFFIRM** the Superior Court as to both of John's constitutional challenges to Section 1448.

## V. CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the Superior Court. We emphasize that we address Johns' challenges—other than the search warrant claim—under a plain error standard of review, and nothing in our opinion should be construed as a suggestion on how we would rule on those issues on the merits in a subsequent case.

---

[163] *See Pitsilides*, 128 F.4th at 212; *See also United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024)("In determining whether an individual has met his burden to demonstrate that he is not dangerous, and thus falls outside of § 922(g)(1)'s constitutionally permissible scope, courts . . . must focus on each individual's specific characteristics. That necessarily requires considering the individual's entire criminal record—not just the predicate offense.").